[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-12902

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

BILLY A. LANEY, JR.,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:23-cr-00006-MW-MJF-1

————————————————

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRANCH, Circuit Judges.

PER CURIAM:

Billy Laney, Jr., appeals his conviction for possessing with intent to distribute 40 grams or more of a substance containing fentanyl. 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi). Laney challenges the denial of his motion to suppress. We affirm.

After a federal grand jury indicted Laney for possessing with intent to distribute 40 grams of a substance containing fentanyl, *id.*, and possessing a firearm and ammunition as a convicted felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2), he moved to suppress the evidence seized from him and the 2014 Nissan Pathfinder that he was driving. He argued that around 9:00 p.m. on February 8, 2022, Officer Demetri Smolkin stopped him for "a malfunctioning tag light." After observing a package of marijuana on the front seat and stating that he smelled "fresh marijuana," Smolkin searched Laney and found several bags of marijuana and a bag containing two pills. Smolkin arrested Laney, and a search of the vehicle revealed a firearm and a black backpack that contained loose marijuana, a mason jar of marijuana, and a mason jar of pills. Laney argued that Smolkin lacked reasonable suspicion for the traffic stop because the license plate was illuminated and complied with Florida law.

The district court held a hearing on the motion. Officer Eryka Brueckner testified that she responded to Smolkin's call for assistance. Although she did not observe the tag light, Smolkin told

her that he stopped Laney for a tag light violation. Brueckner watched Smolkin recover two cell phones from Laney's pockets. On cross-examination, she stated that Smolkin's police car was parked no more than ten feet behind the Pathfinder and that the lights from the police car reflected on the back of the Pathfinder.

April Hantzis, a special agent with the Drug Enforcement Administration, testified that one of Laney's cell phones contained a text message thread that appeared to be family members discussing the traffic stop. One text message from "Nicki" stated, "Dad that light above my tag has NEVER worked." Hantzis explained that "Nicki" was Laney's girlfriend, Domonique Goodine, who owned the Pathfinder. Hantzis testified regarding a YouTube video that depicted the tag lightbulbs of a 2017 Pathfinder being changed. She reviewed images of a model 2014 Pathfinder and concluded that the tag light area appeared the same on the 2017 model.

The government introduced five photographs, Exhibits 2A-2E, of the license plate area of the 2014 Pathfinder taken on the night of the traffic stop, all depicting different angles of the tag light area, as well as videos from the body cameras of Brueckner, Smolkin, and Smolkin's supervisor, Corporal Maguadog. The government acknowledged Smolkin's questionable credibility and "significant disciplinary history" that resulted in his termination from two police departments within a year but argued that his testimony about the tag light was supported by the evidence. Smolkin testified that the reason for the traffic stop was a malfunctioning tag

light that was "out completely" and that he could not see any light on the license plate from 50 feet away.

Roy Tomlinson, a certified service manager at a Nissan dealership who had over 30 years of experience in automobile repair, testified that he had worked on Pathfinders and changed tag lights. Tag lights usually turned on automatically when the parking lights or headlights were on, and the 2014 and 2017 Pathfinder tag light areas were "practically identical," with two lightbulbs under each top corner of the tag area. Tomlinson inspected the government's photographs and stated that although the headlights from the police car behind the Pathfinder were "right on the tag" and made it difficult to determine whether the tag lights were on, he thought that in four of the five photographs "it [did not] appear [that the tag lights] are on to me." As for the fifth photograph, Exhibit 2C, he stated, "I don't see the tag lights."

On cross-examination, Tomlinson explained that although it was rare for both tag lightbulbs to be out at the same time, "[y]ou do see it." He clarified that he could not say with certainty whether the tag lights were off in four of the photographs, but regarding Exhibit 2C, he confirmed that it "doesn't appear the tag lights are on in that picture to me" because the tag light area was "not lighting up to the top of the license plate" even though the taillights were on. The district court inquired whether the dent on the right side of the back of the Pathfinder might have affected the tag light wiring, but Tomlinson could not say so without inspecting the liftgate. On re-direct examination, he clarified that it was possible for

both tag lightbulbs to be out due to a wiring or fuse issue, two bad lightbulbs, or damage to the vehicle.

Kassandra Perez, a criminal defense investigator, testified that she visited a Nissan dealership and video-recorded her inspection of the tag light area of another 2014 Pathfinder. Perez stated that two tag lightbulbs were above the license plate. Regarding Exhibit 2C, Perez stated that the light illuminating the license plate "looked like it was coming from the tag light." After the defense introduced a still photograph from one of the body camera videos, Perez stated that the tag lights appeared to be on but on cross-examination acknowledged that the source of the illumination was not "crystal clear." On cross examination, Perez stated that "those lights could be reflections from the car parked behind it. But it can also be—it's impossible to tell."

The district court denied Laney's motion to suppress. It explained that although Smolkin's testimony alone would have been "problematic" due to his disciplinary history, his testimony was corroborated by other evidence. Smolkin consistently referred to Laney's "tag light" during the traffic stop, which was verifiable by his supervisor who was on the scene, and the text message from Laney's girlfriend corroborated that the tag light did not work. The district court also found persuasive Tomlinson's testimony that, despite many of the blurry photographs depicting illumination from other sources, he saw no working tag lights in Exhibit 2C:

> When I look at [Exhibit 2C], . . . I see no reflection, no light, either at the top of the tag or below the tag. It

> simply is not illuminated. And that is consistent with what was said in the text messages . . . , which is consistent with what [Smolkin] testified he saw that night, which is consistent with what was written in the report, which his consistent with what he said to Mr. Laney when he pulled him over.

Laney pleaded guilty to the possession charge, reserving the right to appeal the ruling on his motion, and the government dismissed the firearm charge. The district court sentenced Laney to 60 months of imprisonment and five years of supervised release.

When reviewing the denial of a motion to suppress, we review legal conclusions *de novo* and findings of fact for clear error, and we view the evidence in the light most favorable to the government. *United States v. Campbell*, 26 F.4th 860, 870 (11th Cir. 2022).

Laney argues that the district court erred in ruling that the government proved by a preponderance of the evidence that his tag lights did not work on the night of the traffic stop and that Smolkin lacked reasonable suspicion to stop him. He contends that the evidence failed to corroborate Smolkin's unreliable testimony. We disagree.

The district court committed no error in denying Laney's motion to suppress. The record supports the finding that neither tag lightbulb worked and that Smolkin initiated the traffic stop with reasonable suspicion of a traffic violation. *See id.* at 880; Fla. Stat. § 316.221(2) (requiring that license plates be illuminated by a

"taillamp or separate lamp" so that the rear license plate is "clearly legible from a distance of 50 feet to the rear."). Smolkin testified that he stopped Laney because his tag light was "out completely." Smolkin told Brueckner and Maguadog the same reason, and the same was recorded in a written report. As the district court explained, Smolkin's credibility issues and multiple disciplinary problems at different police departments were serious but, in the light of supporting evidence, did not establish that he falsified a reason for the traffic stop. Other evidence corroborated Smolkin's testimony, including the text message from Laney's girlfriend to family members after the traffic stop in which she acknowledged that the "light above [the] tag" had never worked. And a certified automobile repairman testified that, despite the police car headlights making it difficult to tell whether the tag lights were on, the tag lights "[did not] appear" to be on in most of the photographs, and in one photograph, Exhibit 2C, he did not "see the tag lights" at all. The district court agreed with Tomlinson's assessment of the photograph and independently found that there was "no reflection, no light, either at the top of the tag or below the tag. It simply is not illuminated." Laney has failed to establish that the findings by the district court were clearly erroneous. *See United States v. Shabazz*, 887 F.3d 1204, 1215 (11th Cir. 2018).

We **AFFIRM** Laney's conviction and sentence.